**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **EDMUNDO GUERRERO, JR.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-11-CV-449-KC** |
| | § | |
| **TOTAL RENAL CARE, INC.** | § | |
| **d/b/a DAVITA a/k/a SIERRA** | § | |
| **MOBILE ACUTE DIALYSIS** | § | |
| **SERVICES,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**ORDER**</u>

On this day, the Court considered five motions in the above-captioned case, including

Plaintiff's Motion for Summary Judgment, ECF No. 23; Defendant's Motion for Summary

Judgment, ECF No. 24; Plaintiff's Motion to Strike Evidence, ECF No. 28; Plaintiff's Motion for

an Oral Hearing, ECF No. 34; and Defendant's Motion to Strike Evidence, ECF No. 37.  For the

reasons set forth below, each of the parties' five motions is **DENIED**.[1]

## I.    PRELIMINARY MATTERS

As explained below in greater detail, Plaintiff claims that Defendant violated the False

Claims Act ("FCA") by terminating Plaintiff's employment in retaliation for an internal report

that Plaintiff allegedly made regarding Medicare and Medicaid fraud by Plaintiff's fellow nurse.

Pl.'s Compl. 1-3, ECF No. 1.  In response, Defendant argues that Plaintiff never made an internal

report regarding Medicare or Medicaid fraud, and that Plaintiff's employment was terminated

---

[1] Because many of the exhibits in the record lack page numbers of their own or are not numbered consecutively, this Order refers to the page numbers supplied at the top of each page of the record by the electronic docketing system. For the purposes of this Order, this convention is applied to all the parties' filings in this case, including the parties' pleadings, motions, and briefs.

1

due to Plaintiff's history of disciplinary problems at work.  Both parties have filed Motions for

Summary Judgment, and both parties' motions must be denied.

Before addressing the substance of these motions, however, the Court first considers

certain preliminary matters.  These include the numerous challenges to the admissibility of

evidence raised in the parties' Motions to Strike Evidence, ECF Nos. 28 and 37, with respect to

which Plaintiff has also filed a Motion for an Oral Hearing, ECF No. 34.  Under Rule 56 of the

Federal Rules of Civil Procedure, "[a] party may object that the material cited to support or

dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ.

P. 56(c)(2); *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515

(5th Cir. 2012).  The Court first examines the parties' Motions to Strike Evidence themselves,

before then turning to evaluate Plaintiff's Motion for an Oral Hearing in its discretion under Rule

CV-7(h) of the Local Court Rules of the Western District of Texas.  *See Sanders v. Agnew*, 306

F. App'x 844, 849 (5th Cir. 2009) (analyzing the pre-2012 version of this rule).

### A.    Defendant's Motion to Strike Evidence

Defendant has objected to three items of evidence offered in support of Plaintiff's Motion

for Summary Judgment, including a news article, a determination rendered by the Texas

Workforce Commission, and a single page from Plaintiff's cellular phone bill.  *See* Def.'s Mot.

to Strike Evidence 4-6.  In the Court's view, all three of these documents are irrelevant to the

present Order, because their only conceivable effect would be to substantiate or undermine the

credibility of certain deposition testimony.[2]  At the summary judgment stage, the Court may not

---

[2] This is demonstrated by Plaintiff's efforts to explain the relevance of these three documents.  That is, Plaintiff has never discussed these documents' relevance without alluding to impeachment and credibility.  Such analysis of credibility is not appropriate at summary judgment.  *See* Pl.'s Resp. to Def.'s Mot. to Strike Evidence 1-5, ECF No. 41 ("[Defendant's] statements to and silence before the [Texas Workforce Commission] concerning the reason, or lack thereof, for [Plaintiff's] termination are admissible for what they show, [Defendant's] attempts to play 'fast and

2

make credibility determinations or weigh evidence. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). The Court's only task at this stage is to assess whether "a genuine issue of material fact" remains for resolution at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).

As set forth in greater detail below, several genuine issues of material fact do indeed remain for resolution at trial based on the parties' conflicting deposition testimony. The balance of this Court's analysis therefore cannot be tilted, at the present stage, in favor of either party by any additional corroboration or impeachment found in the documents challenged by Defendant. In this particular case, the parties' deposition testimony alone demonstrates that the facts are not "so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

Therefore, because the news article, the determination rendered by the Texas Workforce Commission, and Plaintiff's phone bill are each irrelevant to the Court's current task of evaluating the parties' Motions for Summary Judgment, Defendant's Motion to Strike Evidence is hereby **DENIED** as moot. *See Hobbs v. Ketera Techs., Inc.*, 865 F. Supp. 2d 719, 736 (N.D. Tex. 2012); *Wuellner Oil & Gas, Inc. v. EnCana Oil & Gas (USA) Inc.*, 861 F. Supp. 2d 775, 787 (W.D. La. 2012). The Court emphasizes that the present Order does not prejudice any questions concerning these three documents' ultimate admissibility as trial exhibits under the Federal Rules of Evidence.

---

loose' with the Court . . . . The CNN article . . . is evidence used to impeach [Defendant's] prior statements . . . . The cellular phone bill is being introduced to impeach [Defendant's senior staff member's] statements that he made during his deposition . . . . The Latin maxim, '*falsus in unus, falsus in omnibus*' would seem to apply to [Defendant's senior staff member].").

### B.     Plaintiff's Motion to Strike Evidence

For his part, Plaintiff objects to seven items of evidence offered in support of Defendant's Motion for Summary Judgment.  The first of these is the corrected version of the Declaration of Victor Tapia ("Tapia Declaration"), ECF No. 25, filed on December 5, 2012.  Initially, Plaintiff objected to a previous version of the Tapia Declaration that had improperly failed to include the date on which it was executed.  *See* Pl.'s Mot. to Strike Evidence 1.  Defendant had already cured this defect, however, by filing the corrected version of the Tapia Declaration only twenty-four hours after the previous version had been filed, two days prior to the Court's deadline for dispositive motions, and almost two weeks before Plaintiff filed his present Motion to Strike Evidence.  *See* Scheduling Order, ECF No. 17; Pl.'s Mot. to Strike Evidence.  In his three different Reply briefs, Plaintiff chose not to repeat his initial objection regarding the lack of a date of execution, but instead raised a new challenge to the admissibility of the Tapia Declaration under the sham-affidavit doctrine.  Pl.'s Reply to Supp. Mot. for Summ. J. 7, ECF No. 33; Pl.'s Reply to Supp. Mot. for Summ. J. 1-2, ECF No. 38; Pl.'s Reply to Supp. Pl.'s Mot. to Strike Evidence 1-5, ECF No. 42.  Under the sham-affidavit doctrine, a party "may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000).  In Plaintiff's view, the Tapia Declaration contradicts critical aspects of the declarant's previous deposition testimony.  Pl.'s Reply to Supp. Pl.'s Mot. to Strike Evidence 1-4.

The Court considers Plaintiff's sham-affidavit objection waived for the purposes of Defendant's Motion for Summary Judgment, because Plaintiff raised it for the first time in his three Reply briefs, rather than in his initial Motion to Strike Evidence or his Response to Defendant's Motion for Summary Judgment.  *See Jones v. Cain*, 600 F.3d 527, 540-41 (5th Cir.

2010) ("Arguments raised for the first time in a reply brief are generally waived."); *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) (same).  Moreover, the sham-affidavit rule "is applied sparingly" and may be invoked only where there is "some inherent inconsistency between an affidavit and a deposition."  *Axxiom Mfg., Inc. v. McCoy Invs., Inc.*, 846 F. Supp. 2d 732, 749-50 (S.D. Tex. 2012) (quoting *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010)).  In the Court's view, there is no such "inherent inconsistency" between the Tapia Declaration and the declarant's prior deposition testimony.  Plaintiff's arguments regarding certain isolated contradictions, therefore, go to the Tapia Declaration's weight rather than its admissibility.  *See Eicken v. USAA Fed. Savings Bank*, 498 F. Supp. 2d 954, 960-61 (S.D. Tex. 2007) (citing *Williamson v. United States Dep't of Agric.*, 815 F.2d 368, 383 (5th Cir. 1987)).

Additionally, even if the Tapia Declaration does contradict the declarant's previous deposition testimony to some degree, those portions of the Tapia Declaration are also irrelevant to the Court's analysis of the parties' Motions for Summary Judgment.  As set forth below in greater detail, the parties' conflicting deposition testimony already creates several genuine issues of material fact, such that both parties' Motions for Summary Judgment must be denied.  The Tapia Declaration adds nothing to this analysis.  The Tapia Declaration cannot confer any more credibility or evidentiary weight on the declarant's deposition testimony than it already possesses, because the Court may not make credibility determinations or weigh evidence at the summary judgment stage.  *See Man Roland*, 438 F.3d at 478-79 (citing *Reeves*, 530 U.S. at 150). On the other hand, if any inconsistencies between the Tapia Declaration and Defendant's deposition testimony were to raise additional points of disagreement between Plaintiff and Defendant regarding the material facts, this would only create additional grounds to deny the Motions for Summary Judgment.  Accordingly, the Tapia Declaration is largely ignored for the

5

purposes of the present Order.

The only way in which the Court has relied upon the Tapia Declaration is to authenticate the transcription of the declarant's notes from an interview conducted with a patient at Providence Memorial Hospital ("Providence Memorial") prior to the termination of Plaintiff's employment. *See* Tapia Decl. ¶ 9.  This transcription was provided to the Court on December 4, 2012. *See* Def.'s Mot. for Summ. J., Ex. G ("Tapia Investigation Notes"), ECF No. 24-16.  In Plaintiff's original Motion to Strike Evidence on December 18, 2012, Plaintiff objected to this document only on the grounds that it had not been authenticated.  Pl.'s Mot. to Strike Evidence 2.  Nearly two weeks prior, however, the Tapia Declaration had already authenticated this document explicitly as "a true and correct summary of the patient's stated concerns" and therefore satisfied the requirements of Rule 901 of the Federal Rules of Evidence. *See* Tapia Decl. ¶ 9.  The Court therefore will not strike the Tapia Investigation Notes for lack of authentication.

Plaintiff also now raises objections regarding the hearsay character of the Tapia Investigation Notes.  These objections, however, did not appear in Plaintiff's original Motion to Strike Evidence on December 18, 2012, and were raised for the first time in Plaintiff's Reply on January 10, 2013.  The Court therefore considers these objections waived for the purposes of Defendant's Motion for Summary Judgment. *See Jones*, 600 F.3d at 540-41; *Jackson*, 426 F.3d at 304 n.2.  Permitting Plaintiff to raise these hearsay objections for the first time in his Reply would prejudice Defendant, who had already addressed the substance of Plaintiff's Motion to Strike Evidence in its previous Response, ECF No. 36, on January 3, 2013, in accordance with Rule CV-7 of the Local Court Rules.  In the specific context of hearsay, moreover, a party waives a hearsay challenge if he does not "timely object[] or move[] to strike." *See* Fed. R. Ev.

6

103(a)(1); *see also United States v. Everett*, 237 F.3d 631, 2000 WL 1701776, at *5 n.7 (5th Cir.

2000) ("Hearsay admitted without objection 'is to be considered and given its natural probative

effect as if it were in law admissible.'") (quoting *United States v. Gresham*, 585 F.2d 103, 106

(5th Cir. 1978)).  Therefore, the Court will not strike the Tapia Investigation Notes as hearsay.

      The Court further finds that a third item challenged by Plaintiff, the Declaration of Teresa

Isaacs, is also admissible.  *See* Def.'s Mot. for Summ. J., Declaration of Teresa Isaacs ("Isaacs

Declaration"), ECF No. 24-8.  This document was timely challenged by Plaintiff on grounds of

hearsay.  *See* Pl.'s Mot. to Strike Evidence 2.  In the Court's view, however, the Isaacs

Declaration does not contain hearsay because the declarant testifies only to facts within her

personal knowledge: that a complaint was made to her by a patient at Providence Memorial and

that she relayed the complaint to Defendant's staff member.  *See* Isaacs Decl.  The patient's

complaint is not quoted or even described in any detail, and the Isaacs Declaration is not offered

for the truth of the matter described in the patient's complaint.  All facts described in the Isaacs

Declaration are offered, rather, to demonstrate the effect that the patient's complaint had on

Defendant's staff member, who was involved in the decision to terminate Plaintiff's

employment.  This non-hearsay purpose renders the Isaacs Declaration admissible.  *See United*

*States v. Chavis*, 772 F.2d 100, 105 (5th Cir. 1985); *Escobedo v. Dynasty Insulation, Inc.*, 694 F.

Supp. 2d 638, 645 (W.D. Tex. 2010).

      The other four documents challenged by Plaintiff include communications sent internally

between members of Defendant's senior staff and a set of disciplinary records maintained by

Plaintiff's new employer.  *See* Pl.'s Mot. to Strike Evidence 2-3.  As with several of the parties'

objections that have already been considered, the Court finds again that none of these documents

alter the Court's analysis of the genuine issues of material fact raised by the unchallenged

7

portions of the parties' deposition testimony.  The Court cannot rely on these documents to corroborate or impeach the parties' deposition testimony, because the Court cannot make credibility determinations or weigh evidence at the summary judgment stage.  *See Man Roland*, 438 F.3d at 478-79 (citing *Reeves*, 530 U.S. at 150).  Accordingly, the Court need not consider the admissibility of these documents.  *See Hobbs*, 865 F. Supp. 2d at 736; *Wuellner Oil & Gas*, 861 F. Supp. 2d at 787.

To summarize, the Court finds that the Tapia Declaration is admissible to the extent that it authenticates the Tapia Investigation Notes, and that the Tapia Investigation Notes are consequently authenticated and admissible.  The Court also finds that the Isaacs Declaration is admissible as a non-hearsay statement made regarding facts that are within the declarant's first-hand knowledge.  Because the other documents challenged by Plaintiff's Motion to Strike Evidence provide information that is merely duplicative of the parties' unchallenged deposition testimony, or is otherwise irrelevant to the task of the Court at the summary judgment stage, no other challenges raised in Plaintiff's Motion to Strike Evidence need be considered by the Court at this time.

Plaintiff's Motion to Strike Evidence is therefore **DENIED**.  The Court again emphasizes, however, that the present Order does not prejudice the question of whether any of these documents may ultimately be introduced as exhibits at trial.

### C.       Plaintiff's Motion for a Hearing

Plaintiff has also filed a Motion for an Oral Hearing, ECF No. 34, at which Plaintiff seeks to challenge the documents that he considers "sham affidavits."  Under Rule CV-7(h) of the Local Court Rules, the allowance of an oral hearing on a motion of this sort is "within the sole discretion of the court."  *See Sanders*, 306 F. App'x at 849.  In its discretion, the Court finds that

8

oral argument is unnecessary in this case because the briefs and record adequately present the facts and legal arguments.  Moreover, as previously explained, whether or not the challenged declarations are "sham affidavits," the parties' conflicting deposition testimony independently creates several genuine issues of material fact such that both parties' Motions for Summary Judgment must be denied.

The question of which witnesses the fact-finder should ultimately credit will be resolved at trial, and further consideration of these declarations is therefore unnecessary.  Plaintiff's Motion for an Oral Hearing is **DENIED**.

## II.    BACKGROUND

Plaintiff alleges that Defendant terminated his employment in retaliation for Plaintiff's internal report of Medicare and Medicaid fraud, which is prohibited by the FCA's anti-retaliation provisions at 31 U.S.C. § 3730(h).  From February 21, 2005, until August 30, 2011, Defendant employed Plaintiff as a registered nurse.  Def.'s Proposed Undisputed Facts ¶¶ 1, 93, ECF No. 24-1; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ¶¶ 1, 93, ECF No. 29.  Plaintiff provided in-patient dialysis and related services pursuant to contracts between Defendant and various local hospitals, including Providence Memorial, Sierra Medical Center, and Mesa Hills Specialty Hospital.  Def.'s Proposed Undisputed Facts ¶¶ 2-3; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ¶¶ 2-3; *see also* Pl.'s Dep. 15-16, ECF No. 31-3.[3]

There is no dispute that Defendant's senior staff gave Plaintiff very mixed evaluations regarding his performance and discipline over the six years of his employment.  The parties' accounts differ considerably, however, with regard to the events of 2011 that immediately

---

[3] The parties have submitted a number of copies of the deposition transcripts in this case, some of which have been heavily excerpted.  In the present Order, all citations to deposition transcripts refer to the complete copies filed by Plaintiff as a single electronic document, ECF No. 31, on December 19, 2012.

preceded Plaintiff's termination.  Three key incidents are of importance to the motions currently

before the Court.  The first incident involved a misrepresentation made by Hector Alba ("Alba"),

one of Plaintiff's fellow nurses, in a billing document submitted to Defendant's senior staff.  The

second incident involved an encounter between Plaintiff and a patient at Providence Memorial,

about which the patient later complained.  The third incident involved Plaintiff's subsequent

confrontation with a member of Defendant's senior staff, Victor Tapia ("Tapia"), on August 23,

2011.  Plaintiff alleges that he made an internal report during this confrontation with Tapia, in

which he characterized Alba's misrepresentation as an act of Medicare or Medicaid fraud.

Plaintiff alleges that he then repeated this report to a second member of Defendant's senior staff,

Timo Briffa ("Briffa").  Plaintiff argues that he was terminated in retaliation for these reports.

Defendant alleges, however, that Plaintiff never discussed Medicare or Medicaid fraud with

Tapia and Briffa, and that Plaintiff's termination was based purely on his history of disciplinary

problems at work.

     In reviewing the facts of this case in greater detail, the Court first summarizes the mixed

evaluations that Plaintiff received from Defendant's senior staff regarding disciplinary issues.

The Court then turns to review the parties' factual disagreements about the events of 2011.

### A.     Plaintiff's Disciplinary Problems at Work

     The parties generally agree that Plaintiff received mixed evaluations regarding his

discipline over the six years of his employment with Defendant.  Shortly after beginning work in

2005, Plaintiff was counseled by Tapia regarding false information concerning Plaintiff's

educational background in Plaintiff's application for employment.  Def.'s Proposed Undisputed

Facts ¶ 65; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ¶ 65; Pl.'s Dep. 36-37.  Plaintiff,

however, blames these errors on "[t]he resume company" that had handled the application

process.  Pl.'s Dep. 37.

On August 25, 2005, Plaintiff was suspended for thirty days from performing treatments at Sierra Medical Center after one of the hospital's patient transporters reported that he had behaved in an "inappropriate" manner.  Def.'s Proposed Undisputed Facts ¶ 35; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ¶ 35; Pl.'s Dep. 15.  In February 2006, Plaintiff received written warnings for two separate incidents when he did not respond to his pager while on-call. Def.'s Proposed Undisputed Facts ¶ 39; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ¶ 39.  In February 2008, Plaintiff had a conflict with a nurse, who reprimanded him for not wearing a gown in accordance with a hospital's infection-control policy.  Pl.'s Dep. 20.  In September 2009, Plaintiff received a single written warning for two incidents: (1) discussing a fellow nurse's "lack of skills" with a patient, and (2) calling a hospital facility to request that a physician postpone a treatment because the patient was "non-compliant."  Def.'s Mot. for Summ. J., Ex. F ("September 2009 Warning"), ECF No. 24-15.

During the subsequent year and eleven months, however, the record does not reveal any further disciplinary measures taken against Plaintiff.  In a written evaluation on March 8, 2010, Briffa stated that Plaintiff had shown "great improvement in his work quality and attitude." Briffa Dep. 66-67, 77, ECF No. 31.  In the same evaluation, Briffa also wrote that Plaintiff's "documentation is impeccable."  *Id.*  Speaking generally during his deposition, Briffa further testified that he had "always thought [Plaintiff] a very good technical nurse" and "a good nurse as far as patient care" who "[p]ractices a patient-first attitude every day, every patient, every treatment."  *See id.* at 68-69.

**B.      Alba's Misrepresentation**

Tapia testifies that he and his assistant, Christie Veloz ("Veloz"), learned that Alba had

performed a dialysis-related treatment at a client hospital and that Alba had misreported the type of treatment in the documentation relied upon by Defendant to bill the client hospital for services.  Tapia Dep. 48-50.  As Defendant emphasizes in its Motion for Summary Judgment, Tapia testifies that he believes Alba's misrepresentation to have been a "mistake," rather than an intentional falsehood.  *See id.* at 49; *see also* Def.'s Mot. for Summ. J. 7-8, 18-19.  In this regard, Tapia points out that Alba's misrepresentation was only partial.  That is, while Alba misreported the type of treatment in one of the documents, which Tapia calls "the bill part," Alba made an accurate report of the treatment performed in a second document, "the flow sheet."  *Id.* at 50. Tapia testifies that he directed Veloz to correct the erroneous "bill part" after she had discovered this inconsistency and then spoken with Alba to verify that the flow sheet was the correct document.  Tapia Dep. 13, 48-50.

Tapia further testifies that he did not discuss Alba's misrepresentation with anybody but Veloz, and specifically denies ever discussing Alba's misrepresentation with Plaintiff or Briffa. *See id.* at 16-18, 50.  Briffa testifies, however, that he learned about Alba's misrepresentation and its subsequent correction in the course of administering the nurses' payroll, for which he is sometimes required to do "the math at the end."  Briffa Dep. 45-49.  Like Tapia, Briffa also specifically denies ever discussing Alba's misrepresentation or any other aspect of this incident with Plaintiff.  *Id.* at 43, 49.

Plaintiff's own account directly contradicts the testimony of both members of Defendant's senior staff, Tapia and Briffa, in several ways.  Though Briffa says that he never discussed Alba with Plaintiff, Plaintiff testifies that "Briffa told [Plaintiff] verbatim that they were aware of the fact that [Alba] had charged for a procedure that was not done and was not ordered by . . .  Dr. Pazmino, the M.D. . . . . at Providence Memorial Hospital" and that Alba

subsequently "got caught" by Defendant's senior staff.  Pl.'s Dep. 3.  Though Tapia says that he had never talked with Alba directly about the misrepresentation, and that he had never discussed it with Briffa at all, Plaintiff testifies that Briffa told Plaintiff that both Briffa and Tapia "were going to meet with" Alba to discuss the matter.  Pl.'s Dep. 3.  Finally, although Tapia emphasizes his belief that Alba's misrepresentation was a "mistake," *see* Tapia Dep. 49, Plaintiff alleges that Briffa told Plaintiff "that he thought it was fraud on the part of Mr. Alba."  *See* Pl.'s Dep. 4.

Whether Alba's misrepresentation was intentional "fraud" or an unintentional "mistake," it is undisputed that Defendant did not—and customarily would not—*directly* submit Alba's documentation to the federal government as a claim for payment covered by Medicare or Medicaid.  *See* Def.'s Proposed Undisputed Facts ¶¶ 18-21; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ¶¶ 18-21.  It is also undisputed, however, that the records produced by nurses such as Alba are created in part "[f]or purposes of billing that ultimately goes to Medicare/Medicaid."  *See* Tapia Dep. 14, 62.  That is, because some of the patients that are treated by Defendant's nurses are covered under Medicare or Medicaid, the client hospitals may ultimately use certain of Defendant's invoices to support claims to payment under Medicare or Medicaid.  *See* Def.'s Proposed Undisputed Facts ¶¶ 18-21; Pl.'s Resp. to Def.'s Proposed Undisputed Facts ¶¶ 18-21; Tapia Dep. 14, 62.  There has been no evidence in this case regarding specifically how the client hospitals make use of Defendant's invoices in their own billing procedures.

### C.    Plaintiff's Encounter with the Patient at Providence Memorial

Defendant contends that on August 23, 2011, Defendant's senior staff received a complaint about Plaintiff from a patient, which was relayed though Teresa Isaacs ("Isaacs"), the

Hospital Coordinator at Providence Memorial.  Def.'s Proposed Undisputed Facts ¶ 70-71;

Isaacs Decl.; Tapia Dep. 82, 86.  Tapia testifies that he then visited the patient's room at

Providence Memorial to investigate the complaint.  Tapia Dep. 82, 86.  Tapia testifies that the

patient was extremely upset and had a list of serious criticisms about Plaintiff's unprofessional

behavior during a dialysis treatment.  *See id.* at 89.  Tapia testifies that the patient was angry

because Plaintiff, among other things, had called the patient, "bro," and had begun changing the

patient's catheter dressing but had stopped before finishing.  *See id.* at 88-89.

      For his part, Plaintiff testifies that he recalls the interaction with the patient at Providence

Memorial.  Pl.'s Dep. 22-23.  Plaintiff alleges, however, that he never called the patient, "bro,"

and that he did finish changing the patient's catheter dressing.  *Id.*  He also denies other

unprofessional behavior, including watching television and making personal phone calls during

the procedure.  *Id.*  Though Plaintiff recalls preventing the patient from eating, he explains that

this was only because the patient's low blood pressure would cause the patient to become

nauseated by food.  *Id.*

      The Court has not been provided with any testimony directly from the patient.  Nor has

the Court been informed of the patient's name.  Throughout this litigation, Defendant's senior

staff members have referred to the patient only as "the patient."  *See, e.g.*, Tapia Dep. 85.

In particular, Tapia testifies that he has forgotten the patient's name.  *Id.* at 77-78.  Tapia alleges

that he took notes during his interview with the patient at Providence Memorial, although the

original notes have not been provided to the Court.  *See* Tapia Dep. 85.  Tapia testifies that he

may have thrown them away.  *Id.*  The Court has been provided with a typed document that

Defendant alleges was "immediately" transcribed from Tapia's interview notes, although this

document also fails to include the patient's name and bears no date.  *See* Tapia Investigation

14

Notes; Def.'s Proposed Undisputed Facts ¶ 75.  Tapia also testifies that the patient had a BlackBerry device with him at Providence Memorial, and that the patient "wrote everything on the BlackBerry," but the Court has not been provided with a copy of the patient's own notes from the encounter with Plaintiff.  *See* Tapia Dep. 77.

Tapia also testifies as to his understanding that two other witnesses were present during at least part of Plaintiff's encounter with the patient.  These witnesses included the patient's wife and John Molina ("Molina"), who was one of the other dialysis nurses employed by Defendant. Tapia's Dep. 86-88.  Tapia explains that he did interview the patient's wife while speaking with the patient at Providence Memorial.  *Id.* at 88.  As Tapia also explains, however, the "only thing" that the patient's wife "actually witnessed" was "the fact that [the patient] didn't have a dressing change, that it was all open . . . ."  *Id.*  Like the patient himself, however, the patient's wife has not testified in this case and has not been identified by name in any of the parties' filings.

Molina, by contrast, has been deposed regarding Plaintiff's interaction with the patient at Providence Memorial.  *See* Molina Dep., ECF No. 31-1.  In his testimony, Molina does not recall any negative interaction between Plaintiff and Plaintiff's patient on that day.  On the contrary, Molina testifies that Plaintiff "did fine" during that treatment.  *Id.* at 16.  Molina does recall that Plaintiff needed some help from Molina at one point "during the end of the treatment."  *Id.* at 13. Molina testifies that Plaintiff asked Molina to get him a bag of saline from another part of the hospital when the patient's blood pressure had become low.  *Id.* at 14.  Molina testifies that Plaintiff then restored the patient's blood pressure to a normal level by infusing the saline.  *See id.* at 14-16.  To the extent that Plaintiff was distracted while treating the patient, Molina points out that this was at least partially because Plaintiff was busy responding to an inquiry by one of the physicians at Providence Memorial.  *Id.* at 10-13.

Molina also testifies that no member of Defendant's senior staff ever interviewed him regarding his impressions of Plaintiff's encounter with the patient at any time prior or subsequent to the termination of Plaintiff's employment. *Id.* at 17-18. This is confirmed by Tapia's own testimony. Tapia Dep. 97, 103-04. Although Tapia did not speak with Molina about the patient's complaints in the course of his investigation, however, Tapia considers that he nonetheless conducted "a complete investigation" of the incident. *See id.* at 81, 97-98.

As a final matter relating to the encounter between Plaintiff and the patient, this Court has been provided with a brief declaration written by Isaacs, the Hospital Coordinator at Providence Memorial. Isaacs Decl. The Isaacs Declaration confirms that "a patient" made a complaint on August 23, 2011, and that the complaint was of a "serious nature." *Id.* Isaacs does not provide any further detail, however, regarding the nature of the patient's complaint or whether Plaintiff would be subject to a disciplinary suspension from performing treatments at Providence Memorial. *See id.* According to Briffa's understanding, however, Providence Memorial did not suspend Plaintiff from performing treatments at its facilities indefinitely. Briffa Dep. 52-54. Rather, Providence Memorial simply instructed Defendant's senior staff that Plaintiff should not be given any further assignments at Providence Memorial until that particular patient was discharged from the hospital. *Id.* Briffa testifies as to his understanding that the patient "[d]idn't want to be near [Plaintiff]," and that Providence Memorial wanted to prevent any further interactions between Plaintiff and the patient. *Id.* at 54.

### D.     Tapia's Confrontation with Plaintiff at Mesa Hills Specialty Hospital

After speaking with the patient at Providence Memorial, Tapia went immediately to speak with Plaintiff about the patient's complaints. Tapia Dep. 86, 88-91, 99. Plaintiff had left Providence Memorial by that time to treat a second patient at Mesa Hills Specialty Hospital, and

16

was "at the bedside with the patient" when Tapia arrived.  *See* Tapia Dep. 89; Pl.'s Dep. 4.

Calling Plaintiff away from the bedside into the hallway, Tapia began to discuss with Plaintiff

the incident at Providence Memorial.  Pl.'s Dep. 4; Tapia Dep. 89-90.

With one critical difference, Tapia and Plaintiff generally agree about the content of this

discussion.  Tapia testifies that he began to recite the complaints of the patient at Providence

Memorial and that Plaintiff interrupted him.  Tapia Dep. 89.  According to Tapia, Plaintiff

changed the subject from his own unprofessional behavior to the misconduct of Defendant's

other nurses, which had allegedly resulted in fatalities among Defendant's patients.  That is,

Plaintiff stated, "I can't believe you get people killed" and allow "other people [to] get away

with – with things." *Id.*  Tapia testifies that he tried to refocus the discussion on Plaintiff's own

behavior, but that Plaintiff then threatened to "go up to higher management" with his criticisms

of the other nurses.  *Id.* at 89-90.  Tapia testifies that he then told Plaintiff of his intention to

report the matter to Defendant's human resources department and terminated the conversation.

*Id.* at 90.

Importantly, Tapia testifies that Plaintiff never accused other nurses of committing fraud

during this conversation at Mesa Hills Specialty Hospital.  *Id.* at 92.  In this respect, however,

Plaintiff's account differs from Tapia's.  Plaintiff agrees that Tapia began the conversation by

discussing the complaints about Plaintiff's behavior made by the patient at Providence

Memorial.  Pl.'s Dep. 4-5.  Plaintiff also agrees that he then changed the subject to the

misconduct of other nurses, and that this part of the conversation included accusations of

"patients dying . . . . because of results of nursing negligence and nothing's being done." *See id.*

at 5.  But Plaintiff emphasizes that one of his accusations related to the "Medicare/Medicaid

fraud" allegedly committed by Alba, which Plaintiff explains that he learned about during a

17

conversation with Briffa.  *See id.* at 3, 5.  Plaintiff acknowledges that he did not know if Alba's misrepresentation had related in any way to a patient that was actually covered by Medicare or Medicaid.  *Id.* at 6.  Plaintiff testifies as to his impression, however, that "most of the patients that are on dialysis are on Medicare and Medicaid."  *Id.*

According to Plaintiff, Tapia then concluded the conversation by warning Plaintiff that he would "take this situation" to Defendant's human resources department.  *Id.*  Plaintiff further alleges that, after Tapia had left, Plaintiff made a telephone call to Briffa to tell him about his conversation with Tapia.  *Id.*  Plaintiff testifies that he announced to Briffa his intention to inform "the regional operating director" of his concerns about Alba's fraud.  *Id.* at 3.  According to Plaintiff, Briffa warned Plaintiff "to be careful . . . because [Tapia] has a lot of pull" within Defendant's hierarchy.  *Id.*

Briffa, however, contradicts Plaintiff's testimony.  Briffa states that he never spoke with Plaintiff regarding Alba or Medicare and Medicaid fraud.  Briffa Dep. 42, 56-57.  Briffa further testifies that he has no memory of speaking on the telephone with Plaintiff after the confrontation with Tapia at Mesa Hills Specialty Hospital.  *Id.* at 56-57.

E.      **Termination of Plaintiff's Employment**

On August 30, 2011, one week after the incidents at Providence Memorial and Mesa Hills Specialty Hospital, Plaintiff was summoned to Tapia's office.  Pl.'s Dep. 23; Tapia Dep. 108-09.  Briffa was also present.  Briffa 28-29.  Tapia handed Plaintiff a letter explaining that his employment was terminated.  Pl.'s Dep. 23; Tapia Dep. 108-09; Plaintiff's Mot. for Summ. J., Ex. 17 ("Termination Letter"), ECF No. 23-7.

The letter was unsigned, but the signature block indicated that it was from Tapia himself.  *See* Termination Letter.  This letter included no grounds for the termination of Plaintiff's

employment. *Id.* Neither Tapia nor Briffa verbally gave Plaintiff any reasons for his termination on this occasion. Pl.'s Dep. 23; Tapia Dep. 75, 96-97, 108; Briffa 28.

According to Tapia, Plaintiff's employment was terminated not only because of the incident of August 23, 2011, involving the patient at Providence Memorial, but also because of the "accumulation" of Plaintiff's discipline problems over the course of his six years in Defendant's employment. Tapia Dep. 107-12. According to Tapia, these included not only the "write-ups" received by Plaintiff in 2006, 2008, and 2009, but also Plaintiff's general "problem with attitude." *Id.* at 108.

## III.   DISCUSSION

### A.   Standard

A court must enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex*, 477 U.S. at 322-23 (1986); *Weaver*, 529 F.3d at 339. "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). To show the existence of a genuine dispute, the nonmoving party must support its position with citations

to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited by the movant do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

A court resolves factual controversies in favor of the nonmoving party; however, factual controversies require more than "conclusory allegations," "unsubstantiated assertions," or "a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Further, when reviewing the evidence, a court must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland, Inc.*, 438 F.3d at 478-79 (citing *Reeves*, 530 U.S. at 150). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**B.    Analysis**

Plaintiff argues that his employment was terminated in retaliation for the internal reports that he allegedly made in person to Tapia and over the telephone to Briffa on August 23, 2011, regarding the act of "Medicare/Medicaid fraud" allegedly committed by Alba. Pl.'s Proposed Undisputed Facts ¶¶ 18-20; Pl.'s Dep. 3. Plaintiff argues that his termination was therefore a violation of the anti-retaliation provisions of the FCA. Pl.'s Mot. for Summ. J. 5-7. The FCA prohibits adverse actions taken by employers to discourage "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop . . . violations of this subchapter." 31 U.S.C. 3730(h).

Both Plaintiff and Defendant have filed motions for summary judgment, and both parties agree that their motions should be analyzed under the framework created by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* Pl.'s Mot. for Summ. J. 5; Def.'s Mot. for Summ. J. 23. Although the Fifth Circuit has not addressed this question, several federal courts of appeals have held that the familiar burden-shifting analysis established in *McDonnell Douglas* should be applied to FCA retaliation claims, much as it is applied under a variety of statutes governing the employment relationship. *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1240-41 (D.C. Cir. 2012); *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012); *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). Several district courts in the Fifth Circuit have held likewise. *See United States v. City of Dallas*, No. 3:09-CV-1452, 2011 WL 4912590, at *5 (N.D. Tex. Sept. 27, 2011); *Turner v. DynMcDermott Petroleum Operations Co.*, No. 06-1455, 2010 WL 4363403, at *2 (E.D. La. Oct. 21, 2010); *United States ex rel. Dyson v. Amerigroup Tex., Inc.*, No. H-03-4223, 2005 WL 2467689, at *3 (S.D. Tex. Oct. 6, 2005).

This Court, therefore, will also apply the *McDonnell Douglas* burden-shifting framework to analyze the parties' motions for summary judgment in this case. Under the *McDonnell Douglas* framework, if an employee presents sufficient circumstantial evidence to "establish[] a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate . . . reason for the adverse employment action. If the employer succeeds in doing so, the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason is a pretext . . . ." *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332-33 (5th Cir. 2005) (applying *McDonnell Douglas* to a retaliation claim under the Family Medical Leave Act); *see also Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (applying

21

*McDonnell Douglas* to a claim for disability discrimination under the Americans with Disabilities Act).

Under the *McDonnell Douglas* framework, wherever "reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact does remain, which the trier of fact will be called upon to answer." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509-10 (1993); *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 587 (6th Cir. 2002) ("If the parties dispute the facts establishing the prima facie case . . . a question of fact remains for the fact finder to decide."); *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1283 (10th Cir. 1999) ("[E]ven if Defendants had failed to meet their burden of production, Plaintiff's facts in this case were contested and reasonable minds could differ as to whether he established a prima facie case by a preponderance of the evidence."); *see also Sisk v. Picture People, Inc.*, 669 F.3d 896, 899-900 (8th Cir. 2012); *Edwards v. Galveston-Texas City Pilots*, 203 F. Supp. 2d 759, 768 (S.D. Tex. 2002).

As explained below, both parties' motions for summary judgment must be denied. Plaintiff's Motion for Summary Judgment is denied because a reasonable fact-finder could conclude that Plaintiff has not established his prima facie case. Defendant's Motion for Summary Judgment is denied because a reasonable fact-finder could conclude that Defendant's articulated justification for terminating Plaintiff's employment is a pretext.

### 1.      Plaintiff's Motion

In order for his motion for summary judgment to succeed, an employee claiming retaliation under the FCA must first demonstrate that any reasonable fact-finder would conclude that the employee has established the three elements of his prima facie case by a preponderance of the evidence: (1) that the employee engaged in activity protected under the FCA, (2) that his

employer knew he engaged in protected activity, and (3) that his employer took adverse action against him because of the protected activity.  *See United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x. 366, 371-72 (5th Cir. 2011); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994).

In this case, Plaintiff's Motion for Summary Judgment cannot succeed, because there remains a genuine factual controversy as to whether Plaintiff ever engaged in an activity protected under the FCA.  Reasonable minds could differ as to whether a preponderance of the evidence shows that Plaintiff made an internal complaint regarding a falsified record related to a claim for payment from the government.  In this case, therefore, the question of whether the first element of Plaintiff's prima facie case is established by a preponderance of the evidence must be submitted to a jury.  *See Hicks*, 509 U.S. at 509-10; *Cicero*, 280 F.3d at 587; *Galveston-Texas City Pilots*, 203 F. Supp. 2d at 768.

The Fifth Circuit recognizes that internal complaints may constitute a protected activity under the FCA.  *See Patton*, 418  F. App'x at 372 (citing *Robertson*, 32 F.3d at 952); *see also United States ex rel. George v. Boston Scientific Corp*., 864 F. Supp. 2d 597, 605 (S.D. Tex. 2012).  Analyzing cases decided by various federal courts of appeals, the United States District Court for the Southern District of Texas concluded that an internal complaint constitutes a protected activity so long as "the internal complaint allege[s] fraud on the government" such that "the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee . . . ."  *Boston Scientific Corp*., 864 F. Supp. 2d at 606 (quoting *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (alterations in the original)).

However, Plaintiff's contention that he actually made explicit complaints regarding

Alba's "Medicare/Medicaid fraud" to Tapia and Briffa is supported only by Plaintiff's own deposition testimony.  Pl.'s Dep. 2-5.  There is no transcript of these private conversations and Plaintiff does not allege that any written version of his internal complaint was ever created.  For their part, both Tapia and Briffa deny ever discussing Alba's alleged misconduct with Plaintiff.  *See* Tapia Dep. 92; Briffa Dep. 42, 56-57.  At this stage in the proceedings, the Court cannot weigh the respective credibility of these three witnesses' testimony.  *See Man Roland*, 438 F.3d at 478-79 (citing *Reeves*, 530 U.S. at 150).  The Court therefore concludes that because a reasonable fact-finder might ultimately believe the version of events offered by Tapia and Briffa, Plaintiff's prima facie case is not amenable to summary judgment and must be submitted to a jury.  *See Hicks*, 509 U.S. at 509-10; *Cicero*, 280 F.3d at 587.  On this basis alone, Plaintiff's Motion for Summary Judgment is **DENIED**.

### 2.      Defendant's Motion

#### a.      Prima facie case

In order for an employer's motion for summary judgment to succeed, the employer may demonstrate that any reasonable fact-finder would conclude that the employee cannot establish one or more of the elements of his prima facie case by a preponderance of the evidence: (1) that the employee engaged in activity protected under the FCA, (2) that his employer knew he engaged in protected activity, and (3) that his employer took adverse action against him because of the protected activity.  *See Patton*, 418 F. App'x. at 371-72; *Robertson*, 32 F.3d at 951.

#### i.      Protected activity

Here, the Court cannot grant Defendant's Motion for Summary Judgment on the grounds that Plaintiff has presented no evidence to support the first element of his prima facie case.  Just as a reasonable fact-finder could conclude that the testimony of Tapia and Briffa is more credible

than that of Plaintiff, a reasonable fact-finder might also conclude the opposite.[4]  As explained

above, Plaintiff has provided deposition testimony that he engaged in protected activity: the

internal reports of "Medicare/Medicaid fraud" made in person to Tapia and by telephone to

Briffa.  Pl.'s Dep. 2-5.  The first element of Plaintiff's prima facie case therefore is not amenable

to summary judgment and must be submitted to a jury.  *See Hicks*, 509 U.S. at 509-10; *Cicero*,

280 F.3d at 587.

　　　　Defendant argues that this Court should not credit Plaintiff's deposition testimony,

because Plaintiff failed to call Defendant's "compliance hotline," to contact Defendant's "Chief

Compliance Officer," or to repeat his allegations regarding Alba's misrepresentation to

Defendant's human resources department.  *See* Def.'s Mot. for Summ. J. 9, 15.  Defendant

appears to urge an inference that because Plaintiff's alleged investigation into an FCA violation

was left incomplete, it therefore could never have been initiated.  At the summary judgment

stage, however, a district court must draw all reasonable inferences in favor of the nonmoving

party and must not make credibility determinations.  *Man Roland*, 438 F.3d at 478-79 (citing

*Reeves*, 530 U.S. at 150).  The Court therefore cannot adopt Defendant's arguments.

　　　　Defendant also argues that, as a matter of law, the internal complaint allegedly made by

Plaintiff would not constitute protected activity under the FCA even if the facts described in

Plaintiff's testimony were proven conclusively.  Defendant argues, therefore, that it is entitled to

judgment as a matter of law.  Indeed, the Fifth Circuit has upheld summary judgment based on

such an analysis in the past.  In *Patton*, the employee's internal report was not protected by the

---

[4] Even though all three witnesses, including Plaintiff and the two members of Defendant's senior staff, have offered testimony that is arguably "self-serving," this does not render this evidence incompetent for consideration at summary judgment.  A party's own testimony is often "self-serving," but it is not excluded as incompetent for that reason alone.  *See C.R. Pittman Constr. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) (collecting cases).  Therefore, the Court cannot disregard any of these three witnesses' testimony on this basis.

FCA because the summary judgment evidence demonstrated that "the substance of his complaints concerned . . . unsafe or improper construction methods, and not . . . [the] defrauding [of] the government." *See Patton*, 418 F. App'x at 372.

Defendant's argument fails, however, because Plaintiff's internal complaint is sufficiently distinguishable from the internal complaint analyzed in *Patton*. As described in Plaintiff's testimony, the internal complaints made to Tapia and Briffa directly addressed the "Medicare/Medicaid fraud" that Alba had allegedly committed. *See* Pl.'s Dep. 3, 5. As alleged, these internal complaints also had implications that were broader than Alba's misconduct alone. According to Plaintiff, Tapia implicitly "admitted" that he knew about Alba's misconduct, and yet Alba was "still employed." *Id.* at 5. Therefore, Plaintiff's alleged warning to Briffa that he "was going to report it to the regional operating director" may have implicated not only Alba's misconduct, but also the failure of Defendant's senior staff to prevent or punish such misconduct. *See id.* at 3; *see also* Tapia Dep. 89-90 (acknowledging that Plaintiff had threatened to "go up to higher management").

This alleged internal complaint is easily contrasted with the internal complaint regarding "improper construction methods" in *Patton*, 418 F. App'x at 372. Plaintiff's explicit reference to "Medicare/Medicaid fraud" was sufficiently "aimed at matters that reasonably could lead to False Claims Act litigation" to trigger the FCA's anti-retaliation provisions. *See Boston Scientific Corp.*, 864 F. Supp. 2d at 607 (analyzing *Patton*, 418 F. App'x at 372). Plaintiff's alleged complaint of "Medicare/Medicaid fraud" could likewise be contrasted with a second internal complaint that, according to deposition testimony offered by both parties, Plaintiff also raised during his conversation with Tapia: "patients dying . . . because of results of nursing negligence and nothing's being done." *See* Pl.'s Dep. 5-6; Tapia 89 (quoting Plaintiff's

complaint that "I can't believe you get people killed and you get [*sic*] – you get [*sic*] other people get away with – with things."). Unlike Plaintiff's alleged complaint directed at Medicare/Medicaid fraud, this statement would have fallen within the same category as the complaint about unsafe construction methods in *Patton*, 418 F. App'x at 372. Although a very serious accusation involving tragic events, this internal complaint was not "aimed at matters that reasonably could lead to False Claims Act litigation" and therefore is not protected by the FCA's anti-retaliation provisions. *See Boston Scientific Corp.*, 864 F. Supp. 2d at 607 (analyzing *Patton*, 418 F. App'x at 372).

It also does not matter that, as Defendant emphasizes, Defendant does "not bill Medicare or Medicaid" directly. *See* Def.'s Mot. 22; Def.'s Proposed Undisputed Facts ¶¶ 18-21. "The FCA applies to anyone who 'knowingly assist[s] in causing' the government to pay claims grounded in fraud, 'without regard to whether that person ha[s] direct contractual relations with the government.'" *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (quoting *Peterson v. Weinberger*, 508 F.2d 45, 52-53 (5th Cir. 1975)). Even if Defendant does not itself hold a government contract, Alba or Defendant's other staff could have violated the provisions of the FCA that prohibit "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B); *see United States v. BNP Paribas SA*, 884 F. Supp. 2d 589, 610 n.48 (S.D. Tex. 2012).

There has been no testimony in this case regarding specifically how the client hospitals make use of Defendant's invoices in their own billing procedures. For the purposes of Defendant's Motion for Summary Judgment, the Court must draw all reasonable inferences in favor of Plaintiff. *Man Roland*, 438 F.3d at 478-79 (citing *Reeves*, 530 U.S. at 150). Therefore,

27

the Court must draw an inference at this stage that Defendant's invoices are material to the process by which the client hospitals submit claims for payment to Medicare and Medicaid. *See* Pl.'s Dep. 6 ("[M]ost of the patients that are on dialysis are on Medicare and Medicaid."); *see also* Tapia Dep. 6, 14, 62 (confirming that "some of these patients are on Medicare/Medicaid" and that the nurses' records are created partially "[f]or purposes of billing that ultimately goes to Medicare/Medicaid"). It is therefore reasonable that Defendant might have "feared being reported to the government for fraud or sued in a *qui tam* action by the employee . . . ." *See Boston Scientific Corp*., 864 F. Supp. 2d at 606 (quoting *Sanchez*, 596 F.3d at 1304). Any adverse action taken by Defendant in retaliation for Plaintiff's internal complaint, therefore, would have fallen under the anti-retaliation provisions of 31 U.S.C. § 3730(h).

Defendant is also wrong to argue that Plaintiff's internal complaint could not constitute protected activity because Plaintiff admits that he never learned for certain whether the patient whose dialysis treatment was allegedly misrepresented by Alba was covered under Medicare or Medicaid. *See* Def.'s Mot. for Summ. J. 19; *see also* Pl.'s Dep. 6 ("I was not aware if the patient was on Medicare or Medicaid."). To prevail on a claim under 31 U.S.C. § 3730(h), it is not necessary that the employee develop "a winning qui tam action." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 739 (D.C. Cir. 1998); *United States ex rel. Brinlee v. AECOM Gov't Servs., Inc.*, No. 2:04-CV-310, 2007 WL 1232205, at *3 (W.D. La. April 25, 2007). Rather, the statute requires only that the plaintiff have engaged in "acts . . . in furtherance of an action under this section." 31 U.S.C. § 3730(h). The provision protecting all acts "in furtherance" of FCA litigation has been held to include "investigations, inquiries, testimonies, or other activities." *Boston Scientific Corp*., 864 F. Supp. 2d at 606 (collecting cases).

As described in Plaintiff's deposition testimony, Plaintiff's internal complaint and his

related threat to "report it to the regional operating director" could indeed have constituted preliminary steps in such a protected investigation.  Pl.'s Dep. 3.  Later steps could have revealed that Alba's patient was indeed covered by Medicare or Medicaid, or that other similar misrepresentations related to patients that were covered by Medicare or Medicaid, because at least some percentage of Defendant's dialysis patients are covered by these government programs.  *See* Pl.'s Dep. 6; Tapia Dep. 6.

The Court therefore finds that Defendant is not entitled to a judgment as a matter of law based on the first element of Plaintiff's prima facie case.

### ii.        Notice

The second element of Plaintiff's prima facie case is that "[t]he employer must be on notice that the employee is investigating fraud."  *Boston Scientific Corp.*, 864 F. Supp. 2d at 607-08 (citing *Patton*, 418 F. App'x. at 372).  It is sufficient merely that "the employee complained directly to her supervisors," so long as the employee "specifically tell[s] the employer that he is concerned about possible fraud."  *Id.* (quoting *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 105 (D. Conn. 2006)).  At the same time, no "magic words"—such as "illegal" or "unlawful"—are necessary to place the employer on notice of protected activity.  *Id.* (citing *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 484 (7th Cir. 2004)).  "To require an express or even an implied threat of a *qui tam* action would impose an unrealistic requirement on employees—insisting that employees inform their employers of their intention to sue them . . . would eviscerate the FCA's incentives to investigate fraudulent activities."  *Id.* (quoting *Smith*, 415 F. Supp. 2d at 105).

Here, the notice requirement is satisfied by Plaintiff's allegation that he made internal complaints in person to Tapia and over the telephone to Briffa on August 23, 2011, regarding the

act of "Medicare/Medicaid fraud" allegedly committed by Alba.  Pl.'s Proposed Undisputed

Facts ¶¶ 18-20; Pl.'s Dep. 3.  It is irrelevant that Plaintiff did not actually threaten a *qui tam*

action during these conversations, because the language allegedly used would have put

Defendant on "notice that the employee is investigating fraud."  *Boston Scientific Corp.*, 864 F.

Supp. 2d at 607-08 (citing *Patton*, 418 F. App'x. at 372).

### iii.	Adverse action because of the protected activity

As the last element of Plaintiff's prima facie case, "a plaintiff must offer evidence that

would support a reasonable trier of fact in concluding that the plaintiff was terminated, at least in

part, because of her protected activity."  *See id.* at 609 (quoting *Dyson*, 2005 WL 2467689, at

*3); *see also City of Dallas*, 2011 WL 4912590, at *5 (citing *Brandon v. Anesthesia & Pain*

*Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002)).  "The showing necessary to demonstrate

the causal-link part of the prima facie case is not onerous; the plaintiff merely has to prove that

the protected activity and the negative employment action are not completely unrelated."  *Boston*

*Scientific Corp.*, 864 F. Supp. 2d at 609 (quoting *Dyson*, 2005 WL 2467689, at *3).

Here, there is sufficient evidence to "clear the low bar required to establish a prima facie

case."  *See id.* at 608 (quoting *Harrington*, 668 F.3d at 32).  Plaintiff was fired on August 30,

2011, only one week after the alleged internal complaints were made to Tapia and Briffa.  Pl.'s

Dep. 23; Tapia Dep. 108-09.  On this occasion, both Tapia and Briffa were present.  Briffa Dep.

28-29.  Tapia handed Plaintiff a letter explaining that his employment was terminated.  Pl.'s Dep.

23; Tapia Dep. 108-09; Termination Letter.  The letter's signature block indicated that it was

from Tapia himself.  *See* Termination Letter.  Neither Tapia nor Briffa gave any explanation for

the termination of Plaintiff's employment, nor did the text of the letter.  Pl.'s Dep. 23; Tapia

Dep. 75, 96-97, 107-09; Briffa 28-29.

A prima facie case can, in some instances, be made on temporal proximity alone if "the protected act and the adverse employment action are 'very close' in time." *Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir. 2007). "[A] time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). Here, only a week passed between Plaintiff's alleged protected activity and the termination of his employment. This is sufficient evidence to conclude that the two events were not "completely unrelated." *See Boston Scientific Corp.*, 864 F. Supp. 2d at 609. Drawing all inferences in favor of the non-moving party, the Court therefore concludes that Plaintiff has sufficiently established his prima facie case for the purposes of Defendant's Motion for Summary Judgment. *See Man Roland*, 438 F.3d at 478-79 (citing *Reeves*, 530 U.S. at 150).

### b.    Legitimate, nonretaliatory reason for termination

If the employee makes a prima facie showing of retaliation under the *McDonnell Douglas* framework, the burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse employment action. *See Richardson*, 434 F.3d at 332; *Davis*, 383 F.3d at 317. As this burden "is one of production, not persuasion, it can involve no credibility assessment." *Reeves*, 530 U.S. at 142; *see also Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir. 2004) ("[T]he employer need not prove that it was actually motivated by its proffered reason.") (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).

In this case, Defendant has indeed articulated a legitimate, nonretaliatory reason for the termination of Plaintiff's employment. The proffered justification is Plaintiff's disciplinary history. Def.'s Mot. 22-24. As Tapia explains in his testimony, this included not only the incident involving the patient at Providence Memorial on August 23, 2011, but also the

"accumulation" of Plaintiff's disciplinary problems over the course of his six years as

Defendant's employee.  Tapia Dep. 107-12.  According to Tapia, these problems included not

only the "write-ups" received by Plaintiff in 2006, 2008, and 2009, but also Plaintiff's general

"problem with attitude." *Id.* at 108.  Indeed, the Fifth Circuit has held that an employer's need to

prevent and punish employees' insubordinate behavior in the workplace is a legitimate, non-

retaliatory reason for discharging an employee.  *LeMaire v. La. Dep't of Transp. & Dev.*, 480

F.3d 383, 390 (5th Cir. 2007); *see also Corley v. La. ex rel. Div. of Admin., Office of Risk Mgmt.*,

No. 11-31070, 2012 WL 5951550, at *2 (5th Cir. Nov. 29, 2012).  Accordingly, Defendant has

successfully articulated a legitimate reason for the termination of Plaintiff's employment.

### c.      Evidence of pretext

At the third stage of the Court's analysis, because Defendant has successfully articulated

a legitimate reason for the termination of Plaintiff's employment, the burden now "shifts back to

the employee to show by a preponderance of the evidence that the employer's articulated reason

is a pretext . . . ."  *See Richardson*, 434 F.3d at 332-33; *Davis*, 383 F.3d at 319.

The Court has already reviewed the evidence produced by Plaintiff in support of his

prima facie case.  This evidence again comes into play at the third stage of *McDonnell Douglas*,

where the Court once more "may consider evidence establishing [Plaintiff's] prima facie case, as

well as inferences properly drawn therefrom, in its determination of whether [Defendant's]

proffered explanation is pretextual."  *See Laxton v. Gap, Inc.*, 333 F.3d 572, 582 (5th Cir. 2003)

(citing *Reeves*, 530 U.S. at 143).  Besides "the strength of [Plaintiff's] prima facie case," Plaintiff

may also draw the Court's attention to other facts that further indicate that Defendant's

articulated reason is a pretext.  *See id.*  In the Court's view, although each of the facts identified

by Plaintiff may individually be insufficient to demonstrate pretext, a reasonable fact-finder

32

could find pretext in this case "[u]pon consideration of all of the evidence" collectively.  *See id.*
The evidence is therefore sufficient to conclude at this stage that Defendant's "explanation is
false or unworthy of credence . . . even without further evidence of [D]efendant's true motive."
*Id.* at 578 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)).

As the Court previously observed in its analysis of Plaintiff's prima facie case, the
termination of Plaintiff's employment occurred only one week after the alleged internal
complaint to Defendant's senior staff members, Tapia and Briffa.  Besides the close temporal
proximity of Plaintiff's alleged internal complaint to the termination of Plaintiff's employment, a
number of other circumstances indicate that Defendant's proffered justification is a pretext.

First, the same two members of Defendant's senior staff were involved in both Plaintiff's
alleged protected activity and the termination of his employment.  Plaintiff allegedly made
internal complaints only to Tapia and Briffa, and only Tapia and Briffa were present when he
received the letter of termination.  Tapia and Briffa may also have interpreted Plaintiff's threat to
"report it to the regional operating director" as an implied accusation that they had been
complicit in Alba's alleged fraud, particularly since Plaintiff had emphasized the fact that Alba
was "still employed."  *See* Pl.'s Dep. 3-5; Tapia Dep. 89-90 (acknowledging that Plaintiff had
threatened to "go up to higher management" with his allegations).  In a similar case where an
employee had lodged "complaints against her supervisors," and "these same supervisors"
subjected the employee to a series of adverse measures, the United States District Court for the
Southern District of Mississippi has held that a reasonable juror might therefore infer retaliation.
*Duhon v. Napolitano*, No. 1:11-CV-334, 2013 WL 704894, at *7 (S.D. Miss. Feb. 26, 2013).
Such an inference would also be permissible here based on the involvement of Tapia and Briffa
in both the alleged protected activity and the termination of Plaintiff's employment.

33

Second, neither of these two men gave Plaintiff an explanation for the termination of his employment, even though they had worked together for the previous six years.  *See* Briffa Dep. 91 (confirming that there was no "discussion concerning the reasons" for Plaintiff's termination); Tapia Dep. 75, 96-97, 108 (confirming that Tapia "didn't give [Plaintiff] . . . any reasons for his termination."); Pl.'s Dep. 23.  Even the termination letter handed to Plaintiff by Tapia during this exchange lacked any reasons for Plaintiff's termination.  *See* Termination Letter; Tapia Dep. 96-97.

Additionally, important aspects of Defendant's investigation into the incident at Providence Memorial were not documented, "despite testimony that [Defendant] abides by rigorous record-keeping policies."  *See Laxton*, 333 F.3d at 580.  Defendant's senior staff members, including Tapia, Briffa, and a third senior administrator, Mr. Francisco Gamez, have consistently emphasized in their testimony the importance of documentation in both medical practice and employee administration.  Gamez Dep. 9-10, ECF No. 31-2; Briffa Dep. 30; Tapia Dep. 81.  Tapia acknowledged in particular the need to conduct "a complete investigation" when assessing the truth of a patient's complaint about a nurse, and the need to "to talk to . . . all the persons . . . that were involved."  Tapia Dep. 79-82.  However, neither Tapia nor any other member of Defendant's senior staff ever interviewed Molina, who was Defendant's only employee present during the incident other than Plaintiff himself.  Tapia Dep. 97, 103-04; Molina Dep. 17-18.  For his part, Molina testifies that there was nothing out of the ordinary about Plaintiff's interaction with the patient at Providence Memorial, and that Plaintiff "did fine" on that occasion.  *See* Molina Dep. 10-16.

Defendant has also failed to provide the Court with any testimony from the patient or his wife, or even with their names.  *See* Def.'s Mot. Summ. J.; Tapia Dep. 77-78; Tapia

Investigation Notes.  Even the brief affidavit from Isaacs, the Providence Memorial administrator, failed to include the names of the patient and his wife or indicate any reason why the names must be kept confidential.  *See* Isaacs Decl.  The Court has been provided with no reason in this case for this consistent omission.[5]  More to the point, Tapia apparently failed to record the names of the patient and his wife even during the course of the pre-termination investigation.  *See* Tapia Dep. 77-78; Tapia Investigation Notes.  The Fifth Circuit has found the absence of "contemporaneous written documentation of any employee complaints, despite testimony that the corporation abides by rigorous record-keeping policies," to support an inference of pretext.  *See Laxton*, 333 F.3d at 580.  In a matter as important as the termination of an employee, the Court finds that the combination of Tapia's failure to record the names of two of the witnesses, the patient and his wife, and Tapia's failure to interview the third witness, Molina, is some evidence that the encounter with the patient at Providence Memorial was a pretext for Plaintiff's termination.

It is also significant, in the Court's view, that Defendant relies so heavily on Plaintiff's history of disciplinary problems, even though only three of these incidents were documented over the course of six years and the most recent of these incidents occurred almost two full years prior to Plaintiff's termination.  *See* Def.'s Proposed Undisputed Facts ¶¶ 35, 65; September 2009 Warning.  The document associated with the 2009 incident, moreover, purports on its face

---

[5] While the Court certainly recognizes that matters involving the physician/patient relationship may be sensitive, no physician/patient privilege can be invoked in a case governed purely by federal law and the Federal Rules of Evidence.  *See Gilbreath v. Guadalupe Hosp. Found. Inc.*, 5 F.3d 785, 791 (5th Cir. 1993); *United States v. Moore*, 970 F.2d 48, 50 (5th Cir. 1992).  Additionally, Defendant has not referred at any time to the parties' detailed Stipulated Confidentiality Agreement, ECF No. 19, in this context.  In this agreement, the parties created procedures by which "information designated as CONFIDENTIAL" would be filed "under seal in an envelope" and the Court would be requested to review these documents in camera.  See Stipulated Confidentiality Agreement 4-5.  Defendant has never invoked these procedures to protect the patient's privacy and enable him to testify regarding the seriousness of his complaints about Plaintiff.

to be an "Initial Written Warning," which appears to be the first step in a chain of progressive disciplinary measures that also ordinarily would include "Final Written Warning," "Suspension" or "Suspension Pending Investigation," and "Termination."  *See* September 2009 Warning. Certainly, the fact that Defendant skipped over these intermediary warnings is not in itself dispositive of pretext, because the "[f]ailure to follow internal procedures is generally not enough to create a genuine issue of fact as to discriminatory motives."  *Grubb v. Southwest Airlines*, 296 F. App'x 383, 390, 2008 WL 4538313 (5th Cir. 2008) (citing *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir. 1993)).  Nonetheless, the Fifth Circuit demonstrated in *Russell v. McKinney Hospital Venture* that a district court may rely in part on an employer's lax application of its own internal disciplinary procedures as evidence of pretext, particularly where the employee had very recently "received a very favorable evaluation from her supervisor."  *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5th Cir. 2000).  Indeed, that was precisely the situation in Plaintiff's case, since Briffa had stated in a written evaluation that Plaintiff had shown "great improvement in his work quality and attitude" and "[p]ractices a patient-first attitude every day, every patient, every treatment."  Briffa Dep. 66-69, 77.  Upon consideration of all this evidence as a whole, a jury could reasonably conclude that Defendant's references to Plaintiff's old disciplinary problems are merely "a laundry list of violations to justify a predetermined decision" to terminate Plaintiff's employment.  *See Laxton*, 333 F.3d at 582.

Accordingly, after a careful review of the record, the Court finds that Plaintiff has demonstrated that a reasonable jury could find by a preponderance of the evidence that Defendant's articulated justification for terminating Plaintiff's employment is only a pretext.  In particular, the Court finds significant the brief period of one week between Plaintiff's alleged protected activity and Plaintiff's termination, the involvement of Tapia and Briffa in both events,

Tapia's failure to provide any reasons for Plaintiff's termination in person or in the termination letter, the failure to record the names of two key witnesses to a critical event and the failure to interview the third and only other key witness, and Defendant's reliance on very old disciplinary problems to justify its decision.

Taken together, the combined effect of this evidence is sufficient for a reasonable fact-finder to conclude that Defendant's "explanation is false or unworthy of credence . . . even without further evidence of [D]efendant's true motive." *See Laxton*, 333 F.3d at 578 (citing *Sandstad*, 309 F.3d at 897). Under the *McDonnell Douglas* framework, therefore, Plaintiff's claim of FCA retaliation must be submitted to a jury. *See Richardson*, 434 F.3d at 332-33; *Davis*, 383 F.3d at 319. Defendant's Motion for Summary Judgment is **DENIED**.

## III.  CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment, ECF No. 23, is **DENIED**.

Defendant's Motion for Summary Judgment, ECF No. 24, is **DENIED**.

Plaintiff's Motion to Strike Evidence, ECF No. 28, is **DENIED**.

Plaintiff's Motion for an Oral Hearing, ECF No. 34, is **DENIED**.

Defendant's Motion to Strike Evidence, ECF No. 37, is **DENIED**.

**SO ORDERED.**

SIGNED this 18th day of March, 2013.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE